

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-1997

# Davis v. Phila Housing Auth

Precedential or Non-Precedential:

Docket 96-1679

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"Davis v. Phila Housing Auth" (1997). *1997 Decisions.* Paper 177.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/177

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 29, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1679

JONATHAN DAVIS, A MINOR, BY HIS PARENT AND
NATURAL GUARDIAN, WENDY DAVIS; WENDY DAVIS,
INDIVIDUALLY AND IN HER OWN RIGHT,

Appellants

v.

PHILADELPHIA HOUSING AUTHORITY; MIRIAM L. SHAW,

Appellees

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 96-01665)

Argued: April 15, 1997

Before: SCIRICA, COWEN, and NYGAARD, Circuit Judges.

(Opinion Filed July 29, 1997)

Robert Savoy, Esq. (Argued)
Suite 301
3 Neshaminy Interplex
Trevose, PA 19503

Counsel for Appellants

Denise J. Baker, Esq. (Argued)
Philadelphia Housing Authority
2012 Chestnut Street
Philadelphia, PA 19103

Counsel for Appellees

**OPINION OF THE COURT**

NYGAARD, Circuit Judge.

Jonathan Davis, a minor, and his mother and legal guardian, Wendy Davis, appeal the dismissal of Counts I through III of their complaint asserting claims against the Philadelphia Housing Authority under three separate theories of liability. The Davises argue that the district court erred by concluding they lacked prudential standing to pursue their claims because their rights were not within the "zone of interests" intended to be protected by Congress under the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. § 4821 et seq. ("Lead Act"). We agree and will reverse the order of the district court.

I.

Beginning in approximately July 1993, the Davises rented an apartment from Miriam Shaw. While living in the apartment, Jonathan Davis was exposed to peeling and chipping lead-based paint which caused him to suffer lead poisoning and severe, permanent injury. As a result of Jonathan's poisoning, Wendy Davis incurred medical expenses and allegedly experienced mental distress.

Before the Davises rented the apartment, it had been inhabited by a woman with a child under the age of seven. During that time, the apartment was part of a low-income rental program entitled Section 8.1 The Section 8 program is administered by the Housing Authority within the City of

_____

1. In its brief, the Housing Authority concedes that Miriam Shaw participated as a landlord in the Section 8 program from the beginning of 1986 through sometime in 1992.

2

Philadelphia and subsidizes the rents of low-income tenants within the private housing market. Section 8 housing assistance is provided by the federal government and authorized by federal legislation enacted, _inter alia_, "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income. . . ." 42 U.S.C. § 1437. To obtain the housing assistance funding, the Housing Authority enters into an Annual Contributions Contract with the United States Department of Housing and Urban Development. 42 U.S.C. § 1437f.

Under the Lead Act and its implementing regulations, all existing housing which receives housing assistance payments under a program administered by HUD, or otherwise receives more than $5,000 in project-based assistance under a federal housing program, is subject to lead inspection and abatement procedures. 42 U.S.C. § 4822; 24 C.F.R. § 882.109(i); 24 C.F.R. § 35.24. These procedures are intended "to eliminate as far as practicable the hazards of lead-based paint poisoning" with respect to the covered housing. _Id._ It is clear that the Section 8 program administered by the Housing Authority falls under the requirements of the Lead Act. It is equally clear that, under the Lead Act and its implementing regulations, the Housing Authority, as a condition of receiving federal funding for low-income housing assistance, has a duty to inspect Section 8 apartments for hazards resulting from lead-based paint and to ensure that any such hazards are eliminated as far as practicable. 42 U.S.C. § 4822(a)(1); 24 C.F.R. § 882.109(i); 24 C.F.R. § 35.24(4).

Following Jonathan's injuries, the Davises filed a civil action, alleging federal and state law causes of action against both the Housing Authority and Miriam Shaw. Counts I through III of the complaint asserted claims against the Housing Authority under three separate theories of liability: (1) 42 U.S.C. § 1983; (2) liability to third party beneficiaries for breach of contract; and (3) direct private rights of action.2 In response, the Housing Authority

---

2. The Davises did not challenge the dismissal of Count IV of their complaint (state law negligence claim) before the district court and do not raise the issue before us. Accordingly, we review only the dismissal of Counts I through III of the complaint.

filed a motion to dismiss the claims against it, arguing that the Davises lacked prudential standing to assert their claims because their rights were not within the "zone of interests" intended to be protected by the Lead Act.

The district court agreed and held that the Davises did not have standing to assert their claims against the Housing Authority. The court reasoned that "[b]ecause Plaintiffs are not participants in the Section 8 housing assistance program, their interests are not consistent with the purpose implicit in the statute at issue. . . . Plaintiffs do not have standing to pursue the claims at issue due to their lack of Section 8 status." Davis v. Philadelphia Hous. Auth., No. 96-1665, 1996 WL 377189, at *3 (E.D. Pa. July 3, 1996). The court then dismissed Counts I-IV of the complaint.3

II.

At the outset, we note the limited scope of the issue we are asked to review; namely, whether the district court erred by dismissing the Davis's claims for lack of standing.4 This issue is analytically distinct from the related question of whether the Lead Act provides Section 8 participants or their successor tenants with either an express or implied cause of action against the Housing Authority for an alleged breach of its duties to inspect for lead-based hazards and to ensure the removal of such hazards in apartment units which are, or at some time were, part of the Section 8 program. In Bowman v. Wilson, 672 F.2d 1145, 1151 n.10 (3d Cir. 1982), we explicitly noted the distinction between a dismissal of a claim for lack of standing based on a failure to satisfy the zone of interests test and a dismissal for failure to state a cause of action. There we stated:

When the question is whether any plaintiffs are entitled to relief under a statute which does not expressly

_____

3. The Davis's state law claims against Miriam Shaw were dismissed by a separate order.

4. We exercise plenary review. UPS Worldwide Forwarding, Inc. v. United States Postal Service, 66 F.3d 621, 624 (3d Cir. 1995) (citations omitted), cert. denied, 116 S.Ct. 1261.

4

provide the relief which is sought, the question is properly framed as whether a cause of action can be implied. The court must in that case decide whether a newly-fashioned remedial structure should be made available to a class of litigants not expressly entitled to relief under the statute.

In contrast, when there already exists a cause of action prescribing a particular remedy for a defined class of persons and the question is simply whether a particular plaintiff is also entitled to that relief, the question is properly addressed as one of standing. In such a case, the inquiry focuses on whether the plaintiff is the proper person to press the claim.

Id. at 1151 n.10 (citations omitted). In the present action, the district court dismissed the Davis's claims against the Housing Authority solely on its conclusion that the Davises did not have standing because their interests "are not consistent with the purposes implicit in the statute at issue." Davis, 1996 WL 377189, at *3. Accordingly, we need not reach the separate question of whether the Lead Act provides the Davises, as successor tenants, with a cause of action against the Housing Authority for its alleged breach of duties.

III.

Turning squarely to the issue of standing, it is undisputed that the Davises were not participants in the Section 8 program at the time they rented the apartment from Miriam Shaw. It is also undisputed, however, that the prior tenants in the apartment were, and therefore during that period the Housing Authority was obligated to perform inspection duties and to ensure that abatement procedures took place pursuant to the Lead Act and its implementing regulations. These facts present us with the central question we must address: whether successor tenants, who move into an apartment that is no longer part of a federal housing program yet are injured as the result of an alleged breach of duty that occurred while the apartment was part of the program, are arguably within the class of persons that Congress intended to benefit under the federal statute

5

at issue. Put another way, are the Davis's rights arguably within the "zone of interests" intended to be protected by Congress under the Lead Act? We conclude that they are and hence, that the district court erred by dismissing the Davis's claims against the Housing Authority based on a lack of standing.5

A.

The Supreme Court has established three elements necessary to satisfy "the irreducible constitutional minimum of standing":

First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be

_____

5. The district court distinguished between the Davises asserting their claims as "successor tenants" and asserting their claims as "non-Section 8 tenants." While it is unclear from the court's opinion what relevant difference it believed this distinction captured, we endorse its distinction because we believe there is an important difference between the two terms based on the facts of this case.

Asserting their claims as "successor tenants" to a previous Section 8 tenant means that the Davises were arguably entitled to a reasonable expectation that the Housing Authority had performed its inspection duties and ensured that abatement procedures had been undertaken as mandated under the Lead Act since the apartment had previously been part of a federal housing assistance program. In contrast, not every "non-Section 8 tenant" could reasonably claim the same expectation. For example, it is hard to imagine that a "non-Section 8 tenant" who moves into a building that has never been part of a federal housing program could assert a claim for breach of duty against the Housing Authority under the Lead Act when there was never an obligation on the part of the Housing Authority to inspect and to ensure the abatement of the apartment in the first place. As such, we are persuaded that it is more reasonable for "successor tenants" to a Section 8 tenant, like the Davises, to claim that their rights fall within the zone of interests covered by the statutory requirements imposed on the Housing Authority under the Lead Act than it is for generic, "non-Section 8 tenants" to make the same claim.

6

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

United States v. Hays, 115 S. Ct. 2431, 2435 (1995) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992)); accord Stehney v. Perry, 101 F.3d 925, 930 (3d Cir. 1996). Here, there is no dispute that these constitutional standing requirements are met. The Davis's claims allege: (1) a concrete harm that has already occurred; (2) caused by the Housing Authority's breach of duty to inspect and to ensure abatement; (3) that is redressible by monetary damages to offset medical expenses and mental distress incurred as the result of the harm caused.6

In addition to the constitutional standing requirements, federal courts have developed prudential standing considerations "that are part of judicial self-government." UPS Worldwide, 66 F.3d at 626 (citation omitted). These considerations require that

(1) a litigant assert his [or her] own legal interests rather than those of third parties, (2) courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances, and (3) a litigant demonstrate that her interests are arguably within the zone of interests intended to be protected by the statute, rule or constitutional provision on which the claim is based.

Wheeler v. Travelers Ins. Co., 22 F.3d 534, 538 (3d Cir. 1994) (internal citations and quotations omitted); accord Stehney, 101 F.3d at 930; UPS Worldwide, 66 F.3d at 626. The purpose of these prudential standing requirements is

---

6. In its brief, the Housing Authority half-heartedly argues that the Davis's claims are inadequate to satisfy the minimums for constitutional standing because the complaint fails to specify a request for money damages aside from attorney's fees. The clear intent of the complaint, however, is to seek monetary damages for actual injuries suffered. In view of Fed.R.Civ.P. 8(f) which provides that "[a]ll pleadings shall be so construed as to do substantial justice," the complaint appears to sufficiently allege the necessary elements for Article III standing. See, e.g., Budinsky v. Commonwealth of Penn. Dept. Env. Resources, 819 F.2d 418, 421 (3d Cir. 1987).

"to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Wheeler, 22 F.3d at 538 (citations omitted). Here, it is clear that the Davis's claims meet the first two prudential standing requirements: the Davises are asserting their own interests and are claiming violations of concrete statutory and regulatory rights. See Stehney, 101 F.3d at 931. Thus, the remaining question is whether the Davis's interests are arguably within the "zone of interests" intended to be protected by the Lead Act and its implementing regulations.

B.

The Supreme Court first formulated the zone of interests test in Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S. Ct. 827, 829–30 (1970). In Data Processing, sellers of data processing services challenged a Comptroller of the Currency ruling that permitted national banks to offer data processing services to their customers. The plaintiffs contested the ruling as contrary to a statute barring bank service corporations from engaging in "any activity other than the performance of bank services for banks." Id. at 155, 90 S. Ct. at 831 (citation omitted). Holding that the plaintiffs had standing, the Court explained the zone of interests test as follows: "[W]hether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. at 153, 90 S.Ct. at 830.

Subsequently, in Clarke v. Securities Indus. Ass'n., 479 U.S. 388, 107 S. Ct. 750 (1987), the Supreme Court provided further guidance as to the contours of the zone of interests test. In Clarke, the Court held that a trade association of securities brokers had standing to challenge a decision by the Comptroller that national banks could operate discount brokerage services in locations outside of their home states. Id. at 394–403, 107 S. Ct. at 754–59. Analyzing the zone of interests test, the Court explained that "[t]he essential inquiry is whether Congress intended for [a particular] class [of plaintiffs] to be relied upon to

8

challenge agency disregard of the law." Id. at 399, 107 S. Ct. at 757 (citations and internal quotations omitted). The Court then proceeded to state:

In cases where the plaintiff is not itself the subject of the contested regulatory action, the [zone of interests] test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

Id. at 399-400, 107 S. Ct. at 757 (citations omitted) (emphasis added).7

Most recently, in Bennett v. Spear, the Supreme Court revisited the zone of interests test in the context of determining whether two Oregon irrigation districts, which had competing economic and other interests in water from the Klamath Irrigation Project, had standing to seek judicial review of a "Biological Opinion" issued by the Fish and Wildlife Service. 117 S. Ct. at 1159-60 (1997). The districts challenged the Biological Opinion under both the citizen-suit provision of the Endangered Species Act and the APA. Id. at 1159. In their complaint, the districts alleged that the restrictions on water delivery recommended by the

_____

7. The zone of interests test is most often described in terms of standing to challenge regulatory or agency actions because the principal cases in which the test has been applied are those involving claims brought under § 702 of the Administrative Procedures Act. Nonetheless, in Clarke the Court explicitly acknowledged that variations of the zone of interests test were applicable in other contexts and that the Court had itself previously listed the zone of interests inquiry among general prudential considerations bearing on standing. 479 U.S. at 400 n.16, 107 S. Ct. at 757 n.16. Most recently, the Court has reaffirmed that the test applies to suits not involving review of federal administrative action and that "the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes." Bennett v. Spear, 117 S. Ct. 1154, 1161 (1997) (citations and internal quotations omitted).

Biological Opinion would "adversely affect plaintiffs by substantially reducing the quantity of available irrigation water" used by the districts. Id. at 1160. The Court of Appeals affirmed the District Court's dismissal of the complaint for lack of jurisdiction, reasoning that "only plaintiffs who allege an interest in the preservation of endangered species fall within the zone of interests protected by the ESA." Id. (quoting Bennett v. Plenert, 63 F.3d 915, 919 (9th Cir. 1995)). The Court reversed, holding that the broad language of the EPA's citizen-suit provision stating that "any person may commence a civil suit," negated the zone-of interests test and expanded standing under the EPA to non-environmentalists like the petitioners in the instant action. Bennett, 117 S. Ct. at 1162-63. Significantly, the Court also held that the districts had standing to seek judicial review of the Biological Opinion under the APA because their economic interests were within the zone of interests that section 7 of the ESA, 16 U.S.C. § 1536, was intended to protect. Id. at 1167-68.

In reaching its decision, the Court reviewed its jurisprudence regarding the zone of interests test and reaffirmed its determination that the test was applicable to suits not involving review of federal administrative action. Id. at 1161. The Court further emphasized that the breadth of the zone of interests test varied according to the provisions of law at issue. Id. Moreover, the Court specified that "[w]hether a plaintiff's interest is `arguably . . . protected . . . by the statute' within the meaning of the zone of interests test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies." Id. at 1167.

Significantly, nothing in the Bennett opinion, or its analysis of the zone of interests test therein, indicates that the Court has retreated from its assertion in Clarke that the zone of interests test is "not meant to be especially demanding." Clarke, 479 U.S. at 399, 107 S. Ct. at 757.8

_____

8. Indeed, the furthest step the Court has ever taken to specifically limit the breadth of the "zone of interests" test in the APA context occurred in Air Courier Conference v. American Postal Workers Union, 498 U.S. 517,

10

C.

We have applied the zone of interests test consistent with the Supreme Court's jurisprudence. For example, in Schering Corp. v. Food and Drug Admin., 51 F.3d 390 (3d Cir.), cert. denied, 116 S.Ct. 274 (1995), we considered whether a competing drug manufacturer concerned about losing profits had standing to maintain an action against the FDA under the Drug Price Competition and Patent Term Restoration Act of 1984. Although the manufacturer was not the direct subject of the regulatory action it sought to challenge, we were persuaded that the manufacturer's competitive interests were consistent with the dual congressional purposes of the Act: (1) aiding generic drug competition; and (2) preserving the safety of commercial drugs. Schering Corp., 51 F.3d at 395-96. Significantly, in determining that the manufacturer had standing to bring its action against the FDA, we described the zone of interests test as follows:

When, as here, the plaintiff is not itself subject to the challenged agency action, the zone of interests test denies a right of review if the plaintiff's interests are only marginally related to the purpose of the statute. The test, however, is not so stringent that it requires the would-be plaintiff to be specifically targeted by Congress as a beneficiary of the statute.

_____

530, 111 S. Ct. 913, 921 (1991), where the Court held that there must be an "integral relationship" between the statutory provisions plaintiffs claim have been violated and the provisions under which plaintiffs claim standing. This "integral relationship" requirement, however, only necessitates that "the plaintiff must establish that the injury he complains of . . . falls within the `zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." Bennett, 117 S.Ct. at 1167 (quoting Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883, 110 S. Ct. 3177, 3186 (1990)).

Importantly, this circuit has expressly held that the Air Courier decision does not establish a "strict zone of interests test contrary to previous Supreme Court precedent, such as Clarke . . . ." UPS Worldwide, 66 F.3d at 630 n.11.

11

Id. at 395 (citations omitted) (emphasis added). We thus indicated that the zone of interests test is not to be applied "stringently" in order to deny standing.

We also endorsed a "liberal" application of the zone of interests test in UPS Worldwide, where we considered the question of whether a private parcel service had standing to challenge the International Customized Mail (ICM) service offered by the U.S. Post Office. The private competitor alleged that the service violated the Postal Reorganization Act, which regulated postal and other rates for mail transported between the United States and other countries. We concluded that the prerequisites of standing had been met, reasoning that an "integral relationship" existed among the relevant statutes relied upon by the private carrier and that "the history of the Postal Service demonstrates that Congress understood that statutes setting postal rates were inextricably linked with those governing the postal monopoly." Id. at 630–31.

Importantly, in the UPS Worldwide opinion we devoted significant attention to the standards underlying the zone of interests test. We first traced the development of the test through the Supreme Court's decisions in Data Processing and Clarke. 66 F.3d at 628–29. We next noted that the Air Courier decision, which added the "integral relationship" requirement to the zone of interests test, had suggested a somewhat stricter test. Id. at 629. We then concluded that the Air Courier decision had done nothing to change the underlying nature of the zone of interests test, opining that the decision had "merely held that a recodification of an entire title of the United States Code, covering hundreds of statutory provisions developed over the course of two centuries, did not constitute one `statute' within the meaning of the zone of interests test." Id. at 630 n.11. Distinguishing Air Courier in this manner, we proceeded to reaffirm that plaintiffs need not be among the intended beneficiaries of the statute under which they are suing in order to satisfy the zone of interests test. Id. at 630 (citations omitted). Our opinion also explicitly rejected the idea that the test was intended to be a strict one. Id. at 630 n.11. In so doing, we again cited the Supreme Court's statement in Clarke that the zone of interests test "is not

12

meant to be especially demanding." Id. (citing Clarke, 479
U.S. at 399, 107 S. Ct. at 757).

IV.

This takes us to the central question before us: whether
the Davises are asserting claims that arguably fall within
the scope of interests intended to be protected by Congress
when it enacted the Lead Act.9 The most relevant portion of
the Lead Act to the this case is 42 U.S.C. § 4822 --
"Requirements for housing receiving Federal assistance."
Subsection (a)(1) of § 4822 states in pertinent part:

The Secretary of Housing and Urban Development . . .
shall establish procedures to eliminate as far as
practicable the hazards of lead based paint poisoning
with respect to any existing housing which may
present such hazards and which is covered by an
application for mortgage insurance or housing
assistance payments under a program administered by
the Secretary or otherwise receives more than $5,000
in project-based assistance under a Federal Housing
program.

Relying on this statutory language, the district court
concluded that "[b]ecause Plaintiffs are not participants in
the Section 8 housing assistance program, their interests
are not consistent with the purposes implicit in the statute
at issue." Davis, 1996 WL 377189, at *3. The district court,
however, overlooked the legislative history of § 4822(a)(1)
and interpreted the statutory provision at issue too
narrowly for purposes of the zone of interests test.

The present § 4822(a)(1) was added to the Lead Act as
part of a group of amendments to the Act passed in 1973.
As the legislative history explains, the amendments were

_____

9. It is clear that an "integral relationship" exists between the statutory
provisions the Davises claim have been violated and the provisions under
which they claim standing. Indeed, the Davises assert standing under
the same statutory provisions that they claim have been violated --
under the Lead Act for their § 1983 claims, and under the United States
Housing Act and the Lead Act for their private right of action and breach
of contract claims.

13

not intended to alter the principal purposes of the Lead Act
which were, inter alia, "to eliminate childhood lead based
paint poisoning by screening, and testing young children
for high blood levels," and "to determine the most effective
means for removing the hazards of lead poisoning in those
residences that present a high risk to the health of young
children." S. Rep. No. 93-130 (1973), reprinted in 1973

U.S.C.C.A.N. 2403, 2404. Instead, the amendments were intended to "ensure that fundamental improvements [would] be developed in lead poisoning programs," and to provide the federal agencies responsible for these programs with increased appropriations to implement and coordinate the desired programs. 1973 U.S.C.C.A.N. at 2405-06.

More specifically, the Senate Report emphasized that the particular amendments related to federal housing, including the provisions of § 4822(a)(1), were influenced by the belief that "it does no good to hospitalize a child for lead sickness and after treatment, return him to the same conditions that caused the disease in the first place." Id. at 2406. The Report also recognized that "once a child has suffered the damage caused by lead poisoning, he is quite likely to get sick again unless the lead paint poisoning hazard is eliminated in his home and environment." Id. These observations in turn persuaded Congress to increase the authorization of funding "for programs to eliminate the hazards of lead paint based poisoning," as established under the terms of § 4822(a)(1). Significantly, the housing amendments, along with the other 1973 amendments, were passed with the following summary statement included as part of the Senate Report:

In summary, the committee cannot overemphasize that the Lead-Based Paint Poisoning Prevention Act has two primary purposes. First, the Act is designed to eliminate the hazards caused by existing lead-based paint. At the same time the Act is intended to begin providing resources to support programs that will search out those youngsters already sickened by lead poisoning so that they may receive medical attention. If full scale programs can be inaugurated to accomplish the two goals, we will be well along the way to achieving a significant health objective.

14

Lead-based paint poisoning manifests itself as a critical threat to millions of Americans, particularly young children. And, as such, this malady is the direct result of an environmental pollutant. Since we have the technology to eliminate the pollutant and to halt the damaging effects of the disease the committee strongly supports measures to curb the spread of this disease. There is no question that we know how to protect America's children from lead-based paint poisoning. The committee agrees that now we must begin to do that.

1973 U.S.C.C.A.N. at 2411.

The broad scope of both the Lead Act and the 1973 amendments, and the Senate Report's focus on the need for the permanent elimination of hazards caused by lead-based paint, suggests that Congress intended more than just children living in housing presently receiving federal funding to reap the benefits of a lead-free residential environment. As the legislative history demonstrates, Congress understood that the permanent removal of lead-based paint hazards from the nation's housing stock was vital to ensure that children were not constantly exposed and reexposed to the harms associated with lead-based paint poisoning. 1973 U.S.C.C.A.N. at 2405-06. As such, it seems clear to us that by requiring HUD to establish procedures to eliminate lead-based hazards in residences receiving federal funding "as far as practicable," Congress intended the lead-based paint hazards to be permanently removed, not abated for only that period of time during which the residence was part of federally funded housing program. From this perspective, it is arguable that Congress expected all children who lived in a residence that was at one time subject to the lead hazard removal requirements of the Lead Act and § 4822(a)(1) to be beneficiaries of the statutory scheme.

Moreover, although the case law is sparse, a number of courts have held that tenants in federally subsidized residences possess cognizable rights under the Lead Act and that they may sue local housing authorities to enforce its provisions. See, e.g., Ashton v. Pierce, 716 F.2d 56, 66-67 (D.C. Cir.), as amended, 723 F.2d 70 (1983); German v.

15

Federal Home Loan Mortgage Corp., 885 F.Supp. 537, 577 (S.D.N.Y.), as clarified, 896 F.Supp. 1385 (1995); Hurt v. Philadelphia Hous. Auth., 806 F. Supp. 515, 525-26 (E.D.Pa. 1992). Given that the primary benefit Congress intended these tenants to enjoy under the Lead Act was the permanent elimination of lead-based paint hazards, we are persuaded that tenants who come to live in these residences after the benefit has already supposedly accrued, (e.g., the lead hazard has been "eliminated as far as practicable"), could at least arguably be considered intended beneficiaries of the statutory and regulatory scheme imposed by the Lead Act and its implementing regulations. Under this view, "successor tenants" like Jonathan Davis would fall squarely under the broad zone of interests that Congress intended to protect with the Lead Act and § 4822(a)(1) -- the rights of children to live in residences where lead-based paint hazards have been "eliminated as far as practicable."

Further, even if the Davises could not arguably be considered intended beneficiaries of the statutory scheme created under the Lead Act and § 4822(a)(1), they may still qualify under the zone of interests test. Under the zone of interests test there is no requirement that the Davises be among the intended beneficiaries of the statute under which they are suing in order to satisfy the test. See, e.g., UPS Worldwide, 66 F.3d at 630 (citations omitted); Schering, 51 F.3d at 395 (citations omitted). Indeed, there are a number of factors that suggest to us that the Davises satisfy the zone of interests test notwithstanding the argument that they are not intended beneficiaries of the Lead Act or § 4822(a)(1). First, the Davises assert claims for damages that are closely related to the purposes of the Lead Act and § 4822(a)(1). See Clarke, 479 U.S. at 399, 107 S. Ct. at 757 (plaintiff does not meet zone of interests test if his "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."). In this respect, the Davises allege that Jonathan suffered permanent injuries from lead-based paint hazards that should have been discovered and abated at an earlier time. Since two of the primary purposes of the Lead Act and the 1973 amendments are to permanently eliminate

16

lead–based paint hazards from the nation's housing and "to protect America's children from lead–based paint poisoning," there seems to be a close correlation between the interests of the Davises and the purposes intended to be served by these statutory provisions. 1973 U.S.C.C.A.N. at 2411. Second, granting the Davises standing to pursue their claims would not interfere with enforcement of the statutory and regulatory scheme created under the Lead Act. In fact, permitting these claims to go forward would only encourage greater enforcement of the inspection and abatement duties imposed on local public housing authorities under the Act. Finally, given that the zone of interests test is "not meant to be especially demanding," Clarke, 479 U.S. at 399, 107 S. Ct. at 757, it is difficult to conclude that the rights asserted by the Davises do not satisfy the liberal standards of the test. As noted above, the Davises are asserting claims closely related to the purposes and the statutory scheme of the Lead Act and there is no question that their specific individual rights, as opposed to generalized grievances, would be vindicated by permitting the suit to go forward. Collectively, these factors are clearly sufficient to satisfy the requirements of the zone of interests test.

V.

In summary, we believe the legislative history of the Lead Act and, more specifically, § 4822(a)(1), makes it clear that the Davis's rights were arguably within the zone of interests that Congress intended to protect under the statute. Moreover, even if the Davises cannot be considered intended beneficiaries of the statutory and regulatory scheme created under the Lead Act, they have alleged violations of rights that are closely related to the interests intended to be protected by the Lead Act and § 4822(a)(1), and hence, we conclude their claims are sufficient to satisfy the zone of interests test and to establish prudential standing. Accordingly, we will reverse and remand the cause to the district court for further proceedings consistent with this opinion.10

_____

10. The Davises have also requested that we reinstate their pendant state law claims against Miriam Shaw which were dismissed pursuant to

17

COWEN, Circuit Judge, dissenting:

I respectfully dissent because I believe the majority has committed two errors in its analysis. First, it has insufficiently recognized the distinction in standing jurisprudence between administrative review cases and private right of action cases, such as this one. Second, the majority has not adequately considered the statutory language of both the Lead-Based Paint Poisoning Prevention Act ("LPPPA"), 42 U.S.C. § 4822(a)(1), and the Residential Lead-Based Paint Hazard Reduction Act of 1992 ("Title X"), 42 U.S.C. §§ 4851 et seq. Read together, the language of these statutes demonstrates that Congress intended that the LPPPA would not benefit the Davises. While the majority correctly observes that one asserting standing need not show that Congress intended to benefit him, I believe that when Congress has expressly indicated its intent not to benefit a particular plaintiff, the standing inquiry is at an end. I discuss these points in turn.

**I.**

As the majority notes, the question for determination is " `whether the interest sought to be protected by the [Davises] is arguably within the zone of interests to be protected or regulated by the statute . . . in question.' " Bennett v. Spear, ___ U.S. ___, #6D 6D6D#, 117 S.Ct. 1154, 1161 (1997) (quoting Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830 (1970)) (alterations added); see Majority slip op. at 18. The majority makes much of the statement by the Court in Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 757 (1987), that "[t]he test is not meant to be especially

_____

a separate order of the district court dated July 24, 1996. After reviewing the district court's order, we are uncertain as to whether the court dismissed these claims because it determined that it lacked jurisdiction after having dismissed the Davis's federal claims against the Housing Authority or rather because the Davises chose not to pursue their claims against Miriam Shaw. Accordingly, on remand the district court should reexamine its dismissal of the pendant state law claims in light of our holding that the Davises have standing to pursue their federal claims against the Housing Authority.

18

demanding." The majority emphasizes this passage from Clarke, see Majority slip op. at 9, and repeats it no less than three times, see id. at 10, 12-13, 17.

Importantly, Clarke, from which the "not . . . especially demanding" language derives, was a case in which the plaintiff sought review of federal administrative action, specifically a ruling by the Comptroller of Currency. See Clarke, 479 U.S. at 390, 107 S.Ct. at 752. Indeed, every opinion used by the majority to guide it in its application of the zone-of-interests analysis was an administrative review case. See Bennett, ___ U.S. at #6D6D 6D#, 117 S.Ct. at 1158 (challenge to ruling by Fish and Wildlife Service); Air Courier Conference of America v. American Postal Workers Union, 498 U.S. 517, 519-20, 111 S.Ct. 913, 915-16 (1991) (challenge to promulgation of regulations by U.S. Postal Service); Data Processing, 397 U.S. at 151, 90 S.Ct. at 829 (action challenging ruling by Comptroller of Currency); UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621, 623 (3d Cir. 1995) (challenge to promulgation of regulations by U.S. Postal Service), cert. denied, ___ U.S. ___, 116 S.Ct. 1261 (1996); Schering Corp. v. Food and Drug Admin., 51 F.3d 390, 391-92 (3d Cir.) (action challenging FDA approval of drug), cert. denied, #6D 6D6D# U.S. ___, 116 S.Ct. 274 (1995).

This case, by stark contrast, is not an administrative review case. The Davises assert that they have a private right of action against the PHA pursuant to § 1983 and the LPPPA. As some commentators have recognized, the Supreme Court has strongly implied that "plaintiffs in [private right of action] cases have to meet a higher threshold test in showing that judicial protection of their interests is intended by the statute in question." William A. Fletcher, The Structure of Standing, 98 Y ALE L.J. 221, 237 n.84 (1988). Indeed, the unanimous Supreme Court recently reiterated the important idea, stemming from Clarke, that "what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the ` " `generous review provisions' " ' of the APA [Administrative Procedures Act] may not do so for other purposes." Bennett, ___ U.S. at ___, 117 S.Ct. at 1161 (quoting Clarke, 479 U.S. at 400 n.16,

19

107 S.Ct. at 757 n.16 (quoting Data Processing, 397 U.S. at 156, 90 S.Ct. at 831)); see also Clarke, 479 U.S. at 400 n.16, 107 S.Ct. at 757 n.16. ("While inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a `zone of interest' inquiry under the APA, it is not a test of universal application."). By contrast to its emphasis on the "not . . . especially demanding" language, the majority relegates this important concept to a footnote. See Majority slip op. at 9 n.7.

The two private right of action cases in which the Supreme Court has applied zone-of-interests analysis give only limited guidance. See Dennis v. Higgins, 498 U.S. 439, 449, 111 S.Ct. 865, 872 (1991); Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318, 320 n.3, 97 S.Ct. 599, 602-03 n.3 (1977). In addition, I am unaware of, and the majority has not cited, any private right of action case from this Court offering any extensive zone-of-interest analysis. That is not to say that we have not applied the analysis in non-agency review situations. When we have done so, however, the party whose standing was in question clearly satisfied the zone-of-interests test and we therefore declined to engage in any extensive analysis. See, e.g., In re Grand Jury, 111 F.3d 1066, 1072 (3d Cir. 1997) ("The privacy interests the [intervenors] assert are certainly within the `zone of interests' that Title III [of the Omnibus Crime Control and Safe Streets Act of 1968] is intended to protect."); Stehney v. Perry, 101 F.3d 925, 931 (3d Cir. 1996) ("[A]s the target of [National Security Agency] regulatory action, [plaintiff's] interests fall within the zone of interests protected by the constitutional and regulatory provisions on which her case is based."); Out Front Prods., Inc. v. Magid, 748 F.2d 166, 168 (3d Cir. 1984) ("[I]t is clear that businesses that are hindered from forming or from entering a new market come within the zone of interests protected by the antitrust laws . . . ."); American College of Obstetricians and Gynecologists v. Thornburgh, 737 F.2d 283, 303 n.21 (3d Cir. 1984) ("[I]ncreased cost [of insurance] caused by a [statutory] provision directed at [plaintiff] . . . places her within the zone of interests of the regulation"), aff'd, 476 U.S. 747, 106 S.Ct. 2169 (1986).

20

The _Clarke_ Court did give some guidance as to the appropriate application of the zone-of-interests test in a private right of action case. It wrote:

The difference made by the APA can be readily seen by comparing the "zone of interest" [jurisprudence] with cases in which a private right of action under a statute is asserted in conditions that make the APA inapplicable. See, _e.g.,_ _Cort v. Ash_, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); _Cannon v. University of Chicago_, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

_Id._ at 400 n.16, 107 S.Ct. at 758 n.16; _see_ Fletcher, _supra,_ at 237 n.84. The reference to _Cort_ and _Cannon_ is somewhat cryptic. The issue in those cases was whether a particular statute granted _anyone_ the right to relief, while in this case, the issue is, assuming _arguendo_ that someone is entitled to relief, whether the Davises are within that class of individuals. As we have explained, the former question goes to whether a cause of action exists (_i.e.,_ a question going to the merits) while the latter is a question of standing. _See_ _Bowman v. Wilson_, 672 F.2d 1145, 1151 n.10 (3d Cir. 1982); Majority slip op. at 4-5. _But see_ David P. Currie, _Misunderstanding Standing_, 1981 SUP. CT. REV. 41, 43 (arguing that the two issues are identical); Fletcher, _supra,_ at 236-37 (same).

In any event, I will not further attempt to articulate the zone-of-interest analysis to be applied in "cases in which a private right of action under a statute is asserted in conditions that make the APA inapplicable." _Clarke_, 479 U.S. at 400 n.16, 107 S.Ct. at 758 n.16. Perhaps the difference in approach is largely inarticulable except to say that the test in a private right of action case is more stringent. Further guidance from the Supreme Court on this topic would, of course, be helpful. Suffice it to say that the majority imposes a test that is "not . . . especially demanding" in a context where a more demanding test is appropriate.1

_____

1. The prudential standing requirements "are`founded in concern about the proper -- and properly limited -- role of the courts in a democratic

21

## II.

The second error committed by the majority is its reliance on the legislative history of the LPPPA to the exclusion of the language of both the LPPPA and Title X. This language demonstrates Congress's intent that individuals in the Davises' position not be benefited by the LPPPA. The Supreme Court has written that it is not necessary that "there be [any] indication of congressional purpose to benefit the would-be plaintiff " in order for that plaintiff to meet the zone-of-interests test. <u>Clarke</u>, 479 U.S. at 399-400, 107 S.Ct. at 757. We have reiterated this view. <u>See</u> <u>Schering</u>, 51 F.3d at 395. However, a plaintiff does not meet the zone-of-interests requirement if his "interests are so marginally related to <u>or inconsistent with</u> the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." <u>Clarke</u>, 479 U.S. at 399, 107 S.Ct. at 757 (emphasis added). In other words, while lack of congressional intent to benefit a particular plaintiff will not be fatal to his claim of standing, a demonstration of congressional intent <u>not</u> to benefit him will be.

In order to answer the zone-of-interests question, it is crucial that we examine the language of "the statutory provision whose violation forms the legal basis for [the] complaint." <u>Bennett</u>, ___ U.S. at ___, 117 S.Ct. at 1167 (emphasis omitted). As the majority notes, 42 U.S.C. § 4822(a)(1) provides, in part:

---

society." <u>Bennett v. Spear</u>, ___ U.S. ___, ___, 117 S.Ct. 1154, 1161 (1997) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205 (1975)). I concede that, given this concern, it is somewhat counterintuitive that plaintiffs seeking to enforce a private right of action should be subject to a more stringent zone-of-interests test than those plaintiffs seeking review of administrative agency action. One would assume that a plaintiff in the latter type of case, having the opportunity to challenge agency action through the political branches of government, would be subject to the more stringent requirement. Nonetheless, we are bound by language in Supreme Court precedent indicating that a more stringent zone-of-interests test is applicable in non-agency review cases. <u>See Bennett</u>, ___ U.S. at ___, 117 S.Ct. at 1161; <u>Clarke v. Securities</u> <u>Indus. Ass'n</u>, 479 U.S. 388, 400 n.16, 107 S.Ct. 750, 758 n.16 (1987)."

22

The Secretary of Housing and Urban Development . . . shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards <u>and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary or otherwise receives more than $5000 in project-based assistance under a federal housing program</u>.

(emphasis added).

I will assume that the majority is correct in concluding that this language, standing alone, does not demonstrate Congress's intent to protect only participants in the section 8 housing assistance program. However, this language does not stand alone. It must be read together with other relevant language in the statutory scheme that Congress has established. In discerning the meaning of the particular provision under which the Davises sue, we are free to "consider any provision that helps us to understand Congress' overall purposes." <u>Clarke</u>, 479 U.S. at 401, 107 S.Ct. at 758; <u>see also id.</u> at 396-97, 107 S.Ct. at 755 (noting that <u>Data Processing</u> Court relied on one statute to find plaintiffs suing under different statute had standing).

Totally absent from the majority's discussion is any mention of Title X. Title X was enacted in 1992 pursuant to Congress's findings that low level lead poisoning, commonly caused by ingesting lead-based paint, was a problem of national significance, affecting as many as 3 million children under the age of six. <u>See</u> 42 U.S.C. § 4851(1), (4). Congress found that lead-based paint hazards predominated in housing built before 1980, and that as many as 3.8 million American homes contained these hazards. <u>See</u> 42 U.S.C. § 4851(3), (5).

Significantly, Congress did not limit the scope of Title X to housing having some connection to the federal government. Rather, unlike the LPPPA, the statute seeks "to eliminate lead-based paint hazards in <u>all</u> housing." 42 U.S.C. § 4851a(1) (emphasis added); <u>see</u> Jane Schukoske, <u>The Evolving Paradigm of Laws on Lead-Based Paint: From</u>

23

Code Violation to Environmental Hazard, 45 S.C. L. REV. 511, 545 (1994); Brett P. Barragate, Note, Time for Legislative Action: Landlord Liability in Ohio for Lead Poisoning of a Tenant, 43 CLEV. S T. L. REV. 529, 535-36 (1995); Karla A. Francken, Comment, Lead-Based Paint Poisoning Liability: Wisconsin Realtors, Residential Property Sellers, and Landlords Beware, 77 MARQ. L. REV. 550, 581 (1994); Jennifer Tiller, Recent Development, Easing Lead Paint Laws: A Step in the Wrong Direction, 18 H ARV. ENVTL. L. REV. 265, 266-67 (1994). Perhaps more significantly, Congress justified the enactment of the more comprehensive Title X in the following terms: "[D]espite the enactment of laws in the early 1970's requiring the Federal Government to eliminate as far as practicable lead-based paint hazards in federally owned, assisted, and insured housing [i.e., the LPPPA], the Federal response to this national crisis remains severely limited." 42 U.S.C. § 4851(7); see also Schukoske, supra, at 545; Tiller, supra, at 266-67.

With regard to private housing, Title X has three major effects. First, it requires disclosure to prospective tenants and buyers of private housing of the hazards of lead-based paint in general, and of any known hazards regarding the property in question. See 42 U.S.C. § 4852d(a)(1), (3); Schukoske, supra, at 548-49; Barragate, supra, at 536; Francken, supra, at 580-83. Violation of the disclosure provisions results in civil liability. See 42 U.S.C. § 4852d(b); Barragate, supra, at 537; Francken, supra, at 583. Second, Title X "establishes a task force to make recommendations to [the Environmental Protection Agency] regarding the feasibility of assessment of lead-based paint hazards throughout the real estate finance system." Schukoske, supra, at 549; see 42 U.S.C. § 4852a(c)(1)-(3); Barragate, supra, at 536. The task force also has the responsibility of "recommend[ing] liability standards for landlords and lenders . . . and propos[ing] ways to increase availability of insurance coverage for contractors and alternative compensation systems for poisoning victims." Schukoske, supra, at 549-50; see 42 U.S.C. § 4852a(c)(6), (7). Finally, Title X provides for the development of standards for the abatement of lead-based paint in residential housing, but largely "leaves to the states the task of developing

24

standards and statutory schemes on lead paint."
Schukoske, supra, at 547-48; see 15 U.S.C. § 2682(c)(1).

Examination of the LPPPA and Title X together
demonstrates that this case is wholly unlike those cases
upon which the majority relies. Each of those cases
involved "[p]laintiffs who suffer[ed] economic injury from
unlawful competition" alleged to be prohibited by " `entry
restricting' statutes.' " Schering, 51 F.3d at 395.
Accordingly, in those cases, "the plaintiff's interests in
protecting its competitive position . . . coincide[d] with the
legislative purpose of imposing an entry restriction." Id.; see
Clarke, 479 U.S. at 403, 107 S.Ct. at 759; Data Processing,
397 U.S. at 155-56, 90 S.Ct. at 831; UPS Worldwide, 66
F.3d at 630-31. Thus, it was at least "arguable" that the
furtherance of the plaintiff's interest in each of those cases
was one beneficial side effect implicit in the legislation in
question, even if it was not the purpose contemplated by
Congress.

Here, by contrast, the plaintiffs' interests do not
"coincide," but instead conflict, with the purpose of the
statute pursuant to which they bring their action. Congress
has enacted two statutes that, read together, demonstrate
that Congress sought to protect the interests of those in
plaintiffs' position by only one of those statutes. Yet the
majority finds that the Davises have standing to assert
rights under the other statutory provision. The majority
thereby fails to heed the Supreme Court's instruction that
the interests of a plaintiff asserting standing must not be
"inconsistent with the purposes implicit in the statute."
Clarke, 479 U.S. at 399, 107 S.Ct. at 757.

This result is not only perplexing but is also at odds with
our system of separation of powers and our tradition of
judicial restraint. Congress, through the give-and-take of
the political process that resulted in the enactment of the
LPPPA and Title X, has created a framework that delicately
balances the competing interests of those exposed to the
hazards of lead-based paint and those who have the power
to abate or eliminate those hazards. True, Title X might not
protect residents of private housing to the same extent that
the LPPPA protects residents of federally-owned and

25

-assisted housing. However, that the Congress chose to strike a somewhat different balance in each context is none of our concern -- it is a policy choice that Congress was entitled to make. We are in no position to upset with an expansive view of the zone-of-interests test the delicate balance that Congress has wrought. That is precisely what the prudential standing requirements were designed to obviate. See Bennett, ___ U.S. at ___, 117 S.Ct. at 1161; In re Grand Jury, 111 F.3d at 1072.

**III**.

I agree with the majority on one crucial point: nothing in the Court's opinion should be construed to mean that the Davises have a cause of action against the PHA. See Majority slip op. at 4-5. But see id. at 15-16 (citing cases that hold that tenants in federally-assisted housing may sue to enforce LPPPA as support for unrelated proposition that Davises possess standing). The majority merely holds that the Davises' interests are "arguably within the zone of interests sought to be protected by" the LPPPA. Data Processing, 397 U.S. at 153, 90 S.Ct. at 830 (emphasis added). Should the PHA wish to file a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FED. R. CIV. P. 12(b)(6), the questions for the district court will become whether the Davises' interests are actually within that zone, see Chem Serv., Inc. v. Environmental Monitoring Sys. Laboratory-Cincinnati , 12 F.3d 1256, 1263 (3d Cir. 1993), and whether a private right of action lies pursuant to the LPPPA and § 1983 at all.

**IV**.

Because I do not agree with the majority that the Davises' interests are even "arguably within the zone of interests" the LPPPA seeks to protect, I respectfully dissent.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

26