

Opinions of the United
States Court of Appeals
for the Third Circuit

12-30-1998

# Conte Bros Auto Inc v. Quaker State Slick

Precedential or Non-Precedential:

Docket 98-5136

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"Conte Bros Auto Inc v. Quaker State Slick" (1998). *1998 Decisions.* Paper 288.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/288

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 30, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5136

CONTE BROS. AUTOMOTIVE, INC. and HI/TOR
AUTOMOTIVE, Individually and on Behalf of all Others
Similarly Situated,

Appellants,

v.

QUAKER STATE-SLICK 50, INC., SLICK 50
MANAGEMENT, INC., SLICK 50 PRODUCTS CORP., SLICK
50 CORP., BLUE CORAL-SLICK 50, INC., BLUE CORAL,
INC., BLUE CORAL-SLICK 50, LTD.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(Civ. No. 97-3796)
District Judge: The Honorable Jerome B. Simandle

Argued: November 4, 1998

Before: SCIRICA and ALITO, Circuit Judges,
and GREEN, District Judge*

(Opinion Filed: December 30, 1998)

_____

*The Honorable Clifford Scott Green, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

JAY W. EISENHOFER (ARGUED)
MEGAN D. McINTYRE
Grant & Eisenhofer, P.A.
1220 N. Market Street, Suite 500
Wilmington, DE 19801

PETER L. MASNIK
KALIKMAN & MASNIK
2 Kings Highway West
Haddonfield, NJ 08033

LEE SQUITIERI
ABBEY, GARDY & SQUITIERI, LLP
212 East 39th Street
New York, NY 10016

Counsel for Appellants

IRVING SCHER
BRUCE A. COLBATH (ARGUED)
GARRY A. BERGER
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

EDWARD T. KOLE
Willentz, Goldman & Spitzer
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, NJ 07095-0985

Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

The issue in this appeal is whether retailers have standing under S 43(a) of the Lanham Act, 15 U.S.C. S 1125(a) (1994), to bring false advertising claims against manufacturers of products that compete with those the retailers sell. The District Court answered this question in the negative and dismissed the Complaint. Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 992 F. Supp.

2

709, 711 (D.N.J. 1998). Based on the facts alleged in the Complaint, we conclude that the retailer plaintiffs do not satisfy the prudential standing requirements implicit in S 43(a) of the Lanham Act. We therefore affirm.

I.

Appellants are a putative nationwide class of retail sellers of motor oil and other engine lubricants that purportedly compete with Slick 50, a Teflon-based engine lubricant manufactured by Appellees. According to the Complaint, Slick 50 features a formula of Teflon suspended in particle form in motor oil. Compl. P 17; App. 16. Appellees' marketing materials state that one quart of Slick 50 substitutes for one quart of regular motor oil at the time of an oil change. Compl. P 18; App. 16. The Complaint alleges that the Appellees falsely advertised that the addition of Slick 50 would reduce the friction of moving parts, decrease engine wear, and improve engine performance and efficiency. See, e.g., Compl.PP 24-29.

In 1996, the Federal Trade Commission ("FTC") brought an action under 15 U.S.C. S 45(a) challenging the veracity of and substantiation for the claimed benefits of Slick 50. Compl. P 31; App. 20. The parties settled. Compl. P 33; App. 21. Under the terms of the settlement, the Appellees were enjoined from disseminating false or unsubstantiated claims regarding Slick 50 and agreed to provide $10 million in discounts, cash rebates and free products to affected consumers by January 1998. 5 Trade Reg. Rep. P 24,301.

Subsequent to the settlement of the FTC suit, Appellants raised the same allegations in this action for damages under S 43(a) of the Lanham Act, 15 U.S.C.S 1125(a) (1994), and certain state consumer protection statutes that are not at issue in this appeal. The Appellants propose to represent:

> [a]ll persons in the United States who, at any time between the time Slick 50 was first marketed to the public and the present, have offered for sale, either as retailers or wholesalers, motor oil products that compete directly with Slick 50.

3

Compl. P 15; App. 13. "Motor oil products," as Appellants use the term in the Complaint, include "engine additive, engine treatment products, motor oil or motor oil additives (sometimes referred to as engine treatments) that compete with" Slick 50. Compl. P 1; App. 9. In addition to the allegations regarding Appellees' asserted misrepresentations, which largely mirror the allegations in the FTC suit, the Complaint alleges that Appellees' false advertisements increased Slick 50's sales and concomitantly decreased sales of the competing products sold by the class members. The harm the Appellants allege they suffered is loss of sales of products they sell, such as regular motor oil, that compete with Slick 50.

Appellees moved to dismiss the Complaint for lack of standing or, in the alternative, to strike the Appellants' class allegations. The District Court dismissed the Complaint on the ground that retailers like Appellants lacked standing under the Lanham Act to pursue false advertising claims against manufacturers of competing products. Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 992 F. Supp. 709, 712-14 (D.N.J. 1998). More specifically, the District Court held that only"direct commercial competitors" or "surrogates" for direct commercial competitors have standing to pursue claims under S 43(a). The District Court also held that the Complaint failed to allege facts sufficient to infer that the requisite direct competitive relationship existed. This appeal followed.

II.

Our review of matters of standing and statutory construction is plenary. Davis v. Philadelphia Hous. Auth., 121 F.3d 92, 94 n.4 (3d Cir. 1997); UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621, 624 (3d Cir. 1995), cert. denied, 561 U.S. 1171, 116 S. Ct. 1261, 134 L.Ed.2d 210 (1996). When reviewing an order of dismissal for lack of standing, we accept as true all material allegations of the complaint and construe them in favor of the plaintiff. Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1017 (1998); Trump Hotels & Casino

4

Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 482 (3d Cir. 1998).

A.

Section 43(a) of the Lanham Act, pursuant to which this suit was brought, provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in a commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. S 1125(a) (emphasis added). The question in this suit is whether, in enacting the Lanham Act, which includes the quoted language, Congress intended to confer standing on plaintiffs in Appellants' position. For the reasons set forth below, we hold that Congress did not so intend, and we therefore affirm.

Standing is comprised of both constitutional and prudential components. Bennett v. Spear, 117 S. Ct. 1154, 1161 (1997) (citing Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). The constitutional component, derived from the Art. III "case" or "controversy" requirement, requires a plaintiff to demonstrate that he or she suffered "injury in fact," that the injury is "fairly traceable" to the actions of the

5

defendant, and that the injury will likely be redressed by a favorable decision. Bennett, 117 S. Ct. at 1161; Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1016-17 (1998).

The parties do not dispute that the allegations in the Complaint satisfy these constitutional standing requirements. Because this issue is jurisdictional, however, we address it here. See Steel Co., 118 S. Ct. at 1011 (question of Art. III standing is threshold issue that should be addressed before issues of prudential and statutory standing). The Complaint alleges that the plaintiff class has lost sales of motor oil products as a result of Appellees' false advertising. Compl. P 43; App. 22. These allegations satisfy the first two components of Art. III standing, injury in fact and causation. Appellants seek, among other things, "monetary damages sufficient to compensate Plaintiffs and the Class members for their lost profits as a result of the Defendants' conduct." Compl. P 51(C); App. 25. The requested relief, if granted, would redress Appellants' alleged injuries and therefore satisfies the redressability requirement. Based on the allegations in the Complaint, we perceive no constitutional obstacle to our consideration of this case.

Under certain circumstances, prudential, as opposed to constitutional, standing considerations limit a plaintiff's ability to bring suit. These prudential considerations are a set of judge-made rules forming an integral part of "judicial self-government." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The aim of this form of judicial self-governance is to determine whether the plaintiff is "a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 n.8, 106 S. Ct. 1326, 1334 n.8, 89 L.Ed.2d 501 (1986); see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S. Ct. 2965, 2970, 86 L.Ed.2d 628 (1985) (federal courts adopt prudential limits on standing "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim") (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99-100, 99 S. Ct. 1601, 1607-08, 60 L.Ed.2d 66 (1979)).

6

No single formula is capable of answering every prudential standing question. Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 400 n.16, 107 S. Ct. 750, 757 n.16, 93 L.Ed.2d 757 (1987) ("Generalizations about standing to sue are largely worthless as such.") (quoting Data Processing Serv. v. Camp, 397 U.S. 150, 151, 90 S. Ct. 827, 829, 25 L.Ed.2d 184 (1970)); see also Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 537 n.33, 103 S. Ct. 897, 74 L.Ed.2d 723 (1983) ("[I]t is simply not possible to fashion an across-the-board and easily applied standing rule which can serve as a tool of decision for every case."). Several considerations falling within the general rubric of prudential standing, however, are typically invoked. Thus, it is generally required (1) that a litigant "assert his [or her] own legal interests rather than those of third parties," (2) that courts "refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances," and (3) that a litigant demonstrate that the asserted interests are arguably within the "zone of interests" intended to be protected by the statute, rule or constitutional provision on which the claim is based. Wheeler v. Travelers Ins. Co., 22 F.3d 534, 538 (3d Cir. 1994) (citations omitted); see also UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621 (3d Cir. 1995); Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 485 (3d Cir. 1998); Davis v. Philadelphia Hous. Auth., 121 F.3d 92, 96 (3d Cir. 1997).

In this case, the Appellants assert their own interests, and their dispute is concrete in nature. Further, neither of the parties has framed the issue by reference to the "zone of interests" test. The issue in this appeal, rather, is the Appellants' statutory standing -- that is, whether Congress intended parties in Appellants' position to have standing to sue under S 43(a).

Though sometimes analogized to the "zone of interests" test identified above, the question of a party's standing to sue under a given statute is not governed exclusively by the "zone of interests" test. The "zone of interests" test developed in the administrative law context where the issue is whether a person aggrieved by an administrative decision

has standing to challenge it under S 10 of the Administrative Procedures Act, 5 U.S.C. S 702 (1994) (the "APA"). See Davis, 121 F.3d at 96-98 (recounting development of "zone of interests" test). Certain attributes of the "zone of interests" test, most notably its liberal tilt toward recognizing standing to challenge agency action, see id. at 98 ("zone of interests" test "not meant to be especially demanding") (quoting Clarke, 479 U.S. at 399, 107 S. Ct. at 757), were developed in the administrative context, and are most applicable there. Clarke, 479 U.S. at 400 n.16 ("The principal cases in which the `zone of interest' test has been applied are those involving claims under the APA, and the test is most usefully understood as a gloss on the meaning of S 702."); cf. Bennett, 117 S. Ct. at 1161 ("[T]he breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the `generous review provisions' of the [APA] may not do so for other purposes.") (citations omitted); see also William A. Fletcher, The Structure of Standing, 98 Yale L. J. 221, 255-263 (1988) (criticizing use of "zone of interest" test outside of administrative context).

The "zone of interests" test, therefore, is not exclusive for determining statutory standing outside of the administrative context in which it was formulated, Clarke, 479 U.S. at 400 n.16, 107 S. Ct. at 757 n.16, 93 L.Ed.2d 757 ("[w]hile inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a `zone of interests' inquiry under the [APA], it is not a test of universal application"); see also Davis, 121 F.3d at 97 n.7 (recognizing that variations of the zone of interests test apply outside of the administrative review context), and it is clear that we are free to consider other barometers of congressional intent in determining whether a party has standing to sue under a particular statute. See Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 537 n.33 (1983) (focusing exclusively on directness of injury or whether injury is "within zone of interests protected by antitrust laws" leads to contradictory and inconsistent results).

8

We believe it is more appropriate to inquire as to the class's statutory standing free from the formalistic constraints of the "zone of interests" test and its links to administrative review. For purposes of determining a party's standing under S 43(a), we equate our task with the inquiry into congressional intent conducted by the Supreme Court in Associated General in determining standing to sue under the Clayton Act. See Clarke, 479 U.S. at 399 (inquiry "at bottom . . . turns on congressional intent"). We turn to this question in Section II(C) infra.

B.

Before reaching this central issue, however, we mustfirst address a related question of statutory interpretation. Because prudential standing doctrine is judge-made and not the product of constitutional restraints on the power of the federal courts to hear claims, Congress can eliminate prudential restrictions on standing if it so desires. Bennett, 117 S. Ct. at 1161; United Food & Commercial Workers Union v. Brown Group, Inc., 517 U.S. 544, 557, 116 S. Ct. 1529, 1536, 134 L.Ed.2d 758 (1996); Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206 (1975); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 103 n.9, 99 S. Ct. 1601, 1609 n.9, 60 L.Ed.2d 66 (1979); Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209, 93 S. Ct. 364, 366, 34 L.Ed.2d 415 (1972). As a matter of statutory interpretation, however, Congress is presumed to incorporate background prudential standing principles, unless the statute expressly negates them. Bennett, 117 S. Ct. at 1162; Brown Group, 517 U.S. at 557, 116 S. Ct. at 1536.

The first inquiry, then, is whether Congress expressly negated prudential standing doctrine in passing the Lanham Act. In determining whether Congress intended to abrogate the background presumption that prudential standing doctrine applies, we consider the statutory text, its structure, and its legislative history. See Bennett, 117 S. Ct. at 1162-63 (considering purpose of Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884 (codified as amended in scattered sections of 16 U.S.C.)), in determining whether Congress abrogated prudential

standing doctrine); Gladstone, 441 U.S. at 107–109, 99 S. Ct. at 1612–13, 60 L.Ed.2d 66 (considering legislative history in determining whether Congress abrogated prudential standing doctrine); cf. Block v. Community Nutrition Inst., 467 U.S. 340, 344, 104 S. Ct. 2450, 2453–54, 81 L.Ed.2d 270 (1984) (whether party has standing to challenge administrative ruling interpreting Agricultural Marketing Agreement Act of 1937 properly determined"not only from its express language, but also from the structure of the statutory scheme, its objectives, [and] its legislative history"). We hold, based on the text of S 43(a), the explicit language of the Lanham Act declaring its purpose, as well as the Lanham Act's legislative history, that Congress did not expressly negate prudential standing doctrine in passing the Lanham Act.

We note first of all that background presumptions of prudential standing apply unless expressly negated by Congress. Bennett, 117 S. Ct. at 1162. The Supreme Court has twice held that Congress has not expressly negated background prudential standing doctrine merely by passing a statute the text of which admits of a broad interpretation. Thus, in Bennett, while the Supreme Court ultimately concluded that Congress intended standing to be limited only by constitutional constraints on the federal judicial power, it did so only after considering the broader purposes of the statute. Id. at 1162–63 ("Our readiness to take the term `any person'1 at face value is greatly augmented by two

_____

1. The statute at issue in Bennet, the Endangered Species Act of 1973, Pub. L. No. 93–205, 87 Stat. 884 (codified as amended in scattered sections of 16 U.S.C.), provides:

> (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf--

> (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

> . . . . . . . .

> (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this

interrelated considerations: that the overall subject matter of this legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of the particular provision in question is to encourage enforcement by so-called `private attorneys general.' "). And in Associated General, the case most directly on point, the Supreme Court held that Congress incorporated prudential standing principles when it promulgated the Clayton Act. Associated General, 459 U.S. at 535 & n.31 (considering prudential limits on standing despite statutory language giving "[a]ny person who shall be injured in his business or property" standing to sue under the Clayton Act).2

Based on the foregoing analysis, we must reject Appellants' contention that they are entitled to bring suit based on a literal reading of S 43(a). Initially, we note that our precedent goes beyond the text of the Lanham Act in determining whether a party has standing. See, e.g., Thorn v. Reliance Van Co., 736 F.2d 929, 931-32 (3d Cir. 1984) (applying plain meaning rule to S 43(a) and then applying prudential standing doctrine before concluding that plaintiff had standing to bring action). The Appellants' plain language argument, moreover, misses the mark for a more fundamental reason. Limiting standing according to well-established prudential standing doctrine does no violence to the plain meaning of the statute, because, as explained above, Congress intends to incorporate prudential standing

_____

> title which is not discretionary with the Secretary. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be . . . .

16 U.S.C. S 1540(g) (1994).

2. Although the Court in Associated General did not make explicit findings regarding whether Congress expressly negated background prudential standing doctrine, the Court has subsequently cited Associated General for precisely that proposition. See Bennett, 117 S. Ct. at 1162 (citing Associated General for the proposition that Congress legislates against the background of prudential standing doctrine unless it is expressly negated). We discuss Associated General at greater length in Section II(C) of this opinion.

11

principles unless it expresses its desire to negate them. Controlling precedent compels us to consider the statutory text in the larger context of both the statute's purpose and its background before we can conclude that Congress intended to confer standing as broadly as the statute's language suggests.

First, we consider the text of the statute in discerning Congressional intent. In Bennett, the Supreme Court considered whether Congress intended to expand standing under the Endangered Species Act of 1973 ("ESA") to the extent permitted by Art. III. The statutory language at issue in the ESA, which said that "any person" could commence suit, is, as noted by the Court, "an authorization of remarkable breadth when compared with the language Congress ordinarily uses." Id. at 1162. It is, indeed, broader than the relevant language in S 43(a), which says that "any person who believes that he or she is or is likely to be damaged" by conduct proscribed by the Lanham Act can bring suit. We find it significant that the Lanham Act limits the class of persons entitled to sue to those who can trace their injury to the anti-competitive conduct proscribed by the Act, and find in the text support for our conclusion that Congress did not abrogate principles of prudential standing. Furthermore, we note that the Supreme Court recently recognized that prudential standing principles were incorporated into the Federal Election Campaign Act of 1971, 86 Stat. 11, as amended, 2 U.S.C. S 431 et seq., an act with operative language at least as expansive as that found in the Lanham Act. Federal Election Comm'n. v. Akins, 118 S. Ct. 1777, 1783 (1998); 2 U.S.C. S 437g(a)(8)(A) (1994) ("[a]ny party aggrieved" may file a petition in district court seeking review).

The structure of the Lanham Act provides further support for our conclusion that Congress did not intend to abrogate prudential limitations on standing. Congress specified its intent in enacting the Lanham Act in S 45 of the statute, which reads in pertinent part:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such

12

commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks, and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. S 1127 (1994) (emphasis added).3 This section makes clear that the focus of statute is on anti-competitive conduct in a commercial context. Conferring standing to the full extent implied by the text of S 43(a) would give standing to parties, such as consumers, having no competitive or commercial interests affected by the conduct at issue. This would not only ignore the purpose of the Lanham Act as expressed by S 45, but would run contrary to our precedent, see Serbin v. Ziebart Int'l Corp., 11 F.3d 1163, 1174 (3d Cir. 1993) (consumers lack standing to bring Lanham Act false advertising claim), and that of other federal appellate courts. See Colligan v. Activities Club of New York, Ltd., 442 F.2d 686 (2d Cir.) (same), cert. denied, 404 U.S. 1004, 92 S. Ct. 559, 30 L.Ed.2d 557 (1971); Barrus v. Sylvania, 55 F.3d 468 (9th Cir. 1995) (same); Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 871 F.2d 697 (7th Cir. 1989) (same). The congressionally-stated purpose of the Lanham Act, far from indicating an express intent to abrogate prudential standing doctrine, evidences an intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers the purposes of the Lanham Act. The Lanham Act's commercial subject matter and express statement of purpose thus distinguish it from the statute considered by the Supreme Court in Bennett. The Supreme Court noted that the subject matter of the ESA -- the environment -- readily admitted of a finding that Congress intended to expand standing to the limit permitted by Art. III. Bennett,

_____

3. The quoted portion of S 45 has not been altered since the Lanham Act was enacted in 1946. See Pub. L. No. 489, reprinted in 1946 U.S.C.C.A.N. 412, 429.

13

117 S. Ct. at 1163 (noting that "the subject of the legislation makes the intent to permit enforcement by everyman even more plausible"). The same cannot be said of the expressly commercial purpose of the Lanham Act.

Our conclusion regarding congressional intent is reinforced by the legislative history of the Lanham Act. The Senate Report regarding the Lanham Act repeatedly references the Act's focus on anti-competitive conduct in the commercial arena. See S. Rep. No. 1333, 79th Cong., 2d Sess. (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275 ("There is no essential difference between trade-mark infringement and what is loosely called unfair competition."); id. (goal of Lanham Act is "to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not"). The legislative history accompanying the 1988 revisions to the Lanham Act further emphasizes the Act's focus on commercial, anti-competitive conduct. See S. Rep. No. 100-515, 100th Cong., 2d Sess., reprinted in 1988 U.S.C.C.A.N. 5577, 5604 (May 12, 1988) (characterizing "competition between the parties" as a "traditional trademark infringement question[ ]"); id. at 5603 (identifying deterrence of acts of "unfair competition" as goal of Lanham Act). Our case law also recognizes the essentially commercial nature of the Lanham Act. Granite State Ins. Co. v. AAMCO Transmissions, Inc., 57 F.3d 316, 321 (3d Cir. 1995) (focus of the statute is on "commercial interests [that] have been harmed by a competitor's false advertising.") (emphasis in original).

In enacting the Lanham Act in 1946, Congress sought to bring together various statutes regarding trademark protection that previously had been scattered throughout the United States Code. See id. at 1275-76 ("There are many reasons why there should be a new trade-mark statute. . . . [Trademark statutes have] been amended from time to time and supplemented by the act of March 19, 1920, which has also been amended in several particulars. The result is a confused situation. . . . It seems desirable to collect these various statutes and have them in a single enactment."). Nothing in the Lanham Act's legislative

14

history evidences an intent to work a major change in the class of plaintiffs entitled to sue for damages. See id. at 1275 ("The present act is substantially the act of February 20, 1905."); S. Rep. No. 100-515, 100th Cong., 2d Sess., reprinted in 1988 U.S.C.C.A.N. 5577, 5604 (May 12, 1988) (language regarding standing to bring action under S 43(a) unchanged by 1988 amendments).

Earlier trademark statutes defined the class of eligible plaintiffs narrowly and in keeping with the goal of federal trademark law to protect good will. See S 7 of 1881 Act, 21 Stat. 502, 504, 46th Cong., 3d Sess. (Mar. 3, 1881) (limiting right to sue to "owners" of trademark); S 16 of 1905 Act, 33 Stat. 724, 728, 58th Cong., 3d Sess. (Feb. 20, 1905) (same); S 4 of 1920 Act, 41 Stat. 533, 534, 66th Cong., 2d Sess. (Mar. 19, 1920) (same). In addition, these earlier acts were drafted against the backdrop of common law doctrine similar to today's prudential standing doctrine that limited the eligible plaintiff class. See Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 102 S. Ct. 2182, 72 L.Ed.2d 606 (1982) ("purpose of the Lanham Act was to codify and unify the common law of unfair competition and trademark protection"); see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 S. Ct. 971, 103 L.Ed.2d 118 (1989) ("law of unfair competition has its roots in the common-law tort of deceit"); see generally 1 J.T. McCarthy, McCarthy on Trademarks and Unfair Competition S 5:2 (4th ed. 1996) (discussing common-law origins of Lanham Act). There is no indication that Congress intended in any of the Lanham Act's statutory precursors, or in the Lanham Act itself for that matter, to abrogate the common law limitations on standing to sue. Cf. Associated General, 459 U.S. at 531-34 (describing congressional intent to incorporate common-law principles constraining class of plaintiffs entitled to sue under Clayton Act).

In light of the text of S 43(a), other textual provisions defining the purpose of the Lanham Act, the Lanham Act's legislative history and its common-law origins, we hold that Congress did not intend to abrogate prudential limitations on the standing of plaintiffs to bring suit under S 43(a).

C.

Our previous opinions analyzing standing under S 43(a) have assumed, without undergoing the analysis prescribed by Supreme Court cases such as Bennett, that prudential standing doctrine limits the class of plaintiffs entitled to bring suit. In Thorn v. Reliance Van Co., 736 F.2d 929 (3d Cir. 1984), we first addressed S 43(a)'s standing requirements.[4] The issue there was whether an individual investor in a bankrupt company had standing to sue for allegedly false advertisements by a competitor of the bankrupt company. Thorn, 736 F.2d at 931. We looked to S 43(a)'s plain language and concluded that "it is this court's function to grant standing to Thorn if he is a person who believes that he has been damaged by [the defendant's] use of false representations." Id. at 932. Because the investor alleged with specificity both "a section 43(a) violation and a resulting injury," we concluded that "the mere fact that Thorn [was] not a competitor of [the defendant] d[id] not, in and of itself, preclude him from bringing suit under section 43(a)." Id. at 933. Though we thus concluded that the plaintiff had satisfied constitutional standing prerequisites, we went on to consider whether "there [we]re any prudential reasons which support a judicial determination that Thorn[was] without standing . . . ." Id. We defined the "dispositive question" of a party's prudential standing as "whether the party has a reasonable interest to be protected against false advertising." Id. (quoting Smith v. Montoro, 648 F.2d 602, 608 (9th Cir. 1981) (quoting 1 R. Callmann, Unfair Competition, Trademarks and Monopolies, S 18.2(b) at 625 (3d ed. 1967))). While we never precisely defined the critical term "reasonable interest," we noted that Thorn's

_____

4. Though S 43(a) was modified after the Thorn decision, the operative language defining the class of persons entitled to bring a private damages action has not undergone substantive change. See Thorn, 736 F.2d at 931 (quoting the then-existing S 43(a): "Section 43(a) provides that an action may be brought `by any person doing business in the locality falsely indicated as that of origin or in the region in which said
locality is situated, or by any person who believes that he is or is likely
to be damaged by the use of any such false description or representation.' ").

16

allegations of injury -- notably the loss of his investment due to the defendant's false advertising campaign-- were "sufficient[ly] direct" to satisfy any prudential standing considerations. Id.

Our subsequent decisions have carried forward this prudential "reasonable interest" requirement and have grappled with defining the term with greater precision. We revisited the issue of standing under S 43(a) in Serbin v. Ziebart Int'l Corp., 11 F.3d 1163 (3d Cir. 1993). In that case, the issue was whether a consumer whose purchase was allegedly influenced by false advertising had standing under the Lanham Act to bring a suit for damages. We held that consumers lack standing to bring false advertising claims under the Lanham Act, and we reaffirmed the principle announced in Thorn that, the plain language of S 43(a) notwithstanding, prudential concerns dictate that a sufficiently direct injury be alleged before standing to sue is recognized:

> The "sufficient direct injury" alleged by Thorn was that his investment in Florida-Eastern was destroyed by the misconduct of one of Florida-Eastern's chief competitors. Thus, this Court's determination that the plaintiff in Thorn had a "reasonable interest to be protected under section 43(a)" permitted a false advertising suit by one who, while not in his own person a competitor of the alleged rogue enterprise, was, nonetheless, so situated that he could quite reasonably be regarded as a surrogate for such competitor.

Serbin, 11 F.3d at 1175 (emphasis added). We fleshed out the concept of "reasonable interest" by quoting extensively from the Callmann treatise relied upon in Thorn in formulating our "reasonable interest" requirement:

> The language of the Lanham Act . . . states that the wrongdoer in cases of false advertising is "liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." Indeed the statute goes further in recognizing that the plaintiff need not even be "in the same line of business and in competition

17

with defendant"; it will be sufficient, in the case of a false designation of origin, that the plaintiff is "doing business in the locality falsely indicated"5 and in the case of a false description of goods or services, that he believes he is or is likely to be damaged, because, for instance, the parties are doing business on different economic levels. The dispositive question should be whether plaintiff has a reasonable interest to be protected against false advertising.

Serbin, 11 F.3d at 1176-77 (emphasis added).

The emphasized language, quoted favorably in Serbin, implies that parties who are not in direct competition (because they are "doing business on different economic levels") nevertheless may have standing to sue if they have a "reasonable interest to be protected against false advertising." This language, implicitly adopted in Serbin, exists in some tension with the District Court's holding that only direct competitors or their surrogates have standing. Moreover, the District Court's holding conflicts with cases from other courts of appeals that confer standing upon parties who are not direct competitors or "surrogates" for the same. See generally 4 Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition S 27:32 at 27-51 (4th ed. 1996) ("With the possible exception of the Ninth Circuit, the courts have held that the plaintiff and defendant need not be in direct competition with each other for plaintiff to have standing to sue . . . under S 43(a)."); see also PPX Enters., Inc. v. Audiofidelity, Inc., 746 F.2d 120 (2d

_____

5. This analysis rests upon an earlier version ofS 43(a), which, unlike the
present statute enacted in 1992, appeared to create two classes of parties with standing to sue. The earlier version of the statute provided that an action could be brought

     by any person doing business in the locality falsely indicated as that
     of origin or in the region in which said locality is situated, or by any
     person who believes that he is or is likely to be damaged by the use
     of any such false description or representation.

15 U.S.C. S 1125(a) (1988) (emphasis added). The text of the present statute, which is quoted earlier in our opinion, does not differentiate textually between the standing of "false designation" plaintiffs and others
to bring suit.

Cir. 1984) (recognizing standing of owner of royalty streams from music recording to bring action against distributor of falsely labeled record albums); Camel Hair & Cashmere Inst., Inc. v. Associated Dry Goods Corp., 799 F.2d 6 (1st Cir. 1986) (trade association of makers of cashmere fibers and fabrics, but not of finished coats, held to have standing to sue for a preliminary injunction against retailers of coats falsely labeled as containing more cashmere than they had).6 For this reason, we do not adopt the standard employed by the District Court in this case as our test for standing under S 43(a).

As discussed earlier, there exists no single overarching test for determining the standing to sue under a given statute. With respect to S 43(a) of the Lanham Act, the Ninth Circuit jurisprudence in this area suggests one alternative. Under Ninth Circuit law, the class of persons entitled to bring suit under S 43(a) depends on what type of Lanham Act violation is being alleged. For violations of the "false association" prong of S 43(a), 7 any party with a "commercial interest in the product wrongfully identified," whether in competition with the defendant or not, has standing to bring a S 43(a) action. Waits v. Frito–Lay, Inc., 978 F.2d 1093, 1009 (9th Cir. 1992). For violations of the "false advertising" prong of S 43(a), 8 only parties who allege a "discernibly competitive injury" have standing. Id. at 1109.

Applying this dichotomous approach, the Ninth Circuit has held that a plaintiff who alleged his name was replaced

---------------------------------------------------------------

6. But see L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc., 9 F.3d 561, 575 (7th Cir. 1993) ("Because Heath is not in the computer business and thus is not a competitor of AT&T, Heath does not have standing to raise the false advertising claim."); Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 872 (10th Cir.) ("[T]o have standing for a false advertising claim, the
plaintiff must be a competitor of the defendant and allege a competitive injury."), cert. denied, 516 U.S. 920 (1995).

7. A "false association" claim refers to false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device. Waits v. Frito–Lay, Inc., 978 F.2d 1093, 1108 (9th Cir. 1992).

8. A "false advertising" claim refers to false representations in advertising
concerning the qualities of goods or services. Waits, 978 F.2d at 1108.

with that of another actor had standing to sue the movie's producer under the "false association" prong even though he was not in competition with the producer. Smith v. Montoro, 648 F.2d 602 (9th Cir. 1981). Similarly, a singer whose distinctive voice was imitated in a commercial was deemed to have standing under the "false association" prong of S 43(a) even though he could not allege a competitive injury vis-a-vis the company that aired the commercial. Waits, 978 F.2d at 1093. On the other hand, a movie producer lacked standing under the "false advertising" prong to bring a S 43(a) suit against various movie theaters who falsely described the movie as bearing an "R" rating as opposed to a "PG" rating because the parties were not competitors. Halicki v. United Artists Communications, Inc., 812 F.2d 1213 (9th Cir. 1987). The Seventh Circuit followed the Ninth Circuit in L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc., 9 F.3d 561, 575 (7th Cir. 1993) ("Because Heath is not in the computer business and thus is not a competitor of AT&T, Heath does not have standing to raise the false advertising claim.").

We reject the Ninth Circuit's approach. Section 43(a) provides no support for drawing a distinction in standing depending on the type of S 43(a) violation alleged. The operative language that provides for standing --"any person who believes that he or she is or is likely to be damaged" -- does not purport to distinguish between the two types of actions available under S 43(a). We also note that the Ninth Circuit's approach has been the subject of criticism in subsequent cases and in scholarly commentary. See, e.g., Guarino v. Sun Co., Inc., 819 F. Supp. 405, 409 (D.N.J. 1993) (declining to follow Ninth Circuit and noting that the distinction has been rejected by McCarthy); 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition S 27:33, at 27-52 to 27-53 (1998) ("The passe semantic argument [in Halicki] that there cannot be `unfair competition' without `competition' between the parties has often been rejected."); James S. Wrona, False Advertising and Consumer Standing Under Section 43(a) of the Lanham Act: Broad Consumer Protection Legislation or a Narrow Pro-Competitive Measure?, 47 Rutgers L. Rev. 1085, 1136-38 (1995) ("The Ninth Circuit should apply the same criteria

20

when reviewing standing under both section 43(a) subparts.").

In short, the Ninth Circuit's approach enjoys no textual support and fragments standing jurisprudence under S 43(a); accordingly, we decline to adopt the Ninth Circuit's reasoning.

The test for antitrust standing set forth by the Supreme Court in Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983), provides an appropriate method for adding content to our "reasonable interest" test, and we therefore adopt it as the test for determining a party's statutory standing under S 43(a) of the Lanham Act. While we are thefirst court of appeals to utilize this standing analysis in the context of a Lanham Act claim, we note that its use has the imprimatur of two prominent commentators in the area. See 4 McCarthy, McCarthy on Trademarks and Unfair Competition S 27:32 n.1 (1998) ("In the author's opinion, some limit on the S 43(a) standing of persons remote from the directly impacted party should be applied by analogy to antitrust law, such as use of the criteria listed in Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983)."); Restatement (Third) Unfair Competition, S 3, cmt. f (1995) ("In determining whether an asserted injury is sufficiently direct to justify the imposition of liability, the Supreme Court's analysis of similar issues under federal antitrust law may offer a useful analogy.").

In Associated General, the Supreme Court addressed the standing of plaintiffs to bring a private action for damages under S 4 of the Clayton Act, which contains language equally expansive as the standing provisions of the Lanham Act. 15 U.S.C. S 15 provides, in pertinent part:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . .

The Supreme Court rejected a "literal reading of the statute," noting that such an interpretation would be "broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an

21

antitrust violation." Associated General, 459 U.S. at 529. Instead, the Court applied principles of "antitrust standing" developed by the lower courts and commentators in determining standing to sue under the Clayton Act. Id. at 535 & n.31 ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."). The Court then identified a number of factors courts should consider in answering this question:

> (1) The nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"? Id. at 538.

> (2) The directness or indirectness of the asserted injury. Id. at 540.

> (3) The proximity or remoteness of the party to the alleged injurious conduct. Id. at 542.

> (4) The speculativeness of the damages claim. Id.

> (5) The risk of duplicative damages or complexity in apportioning damages. Id. at 543-44.

Weighing these factors, the Supreme Court determined that a union, which claimed injury due to the anti-competitive conduct of a multi-employer association with which the union had negotiated a collective bargaining agreement, lacked standing to pursue a private action under the Clayton Act. The union's theory was that the multi-employer association coerced third parties and certain of its members to contract with nonunion entities, thereby restraining the union's business activities. First, the Court noted that the union was neither a consumer nor a competitor in the market in which trade was restrained and that its interests would not necessarily be served or disserved by enhanced competition in the market. Since the primary aim of the Clayton Act is to protect economic freedom in the relevant market, the Court found that the nature of the plaintiff 's injury was outside the"area of congressional concern" and therefore weighed against recognizing standing. Id. at 538-39.

22

Next, the Supreme Court noted that the union's injuries were only an indirect result of whatever harm may have been suffered by the parties who were coerced. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general." Id. at 542.

Finally, the Supreme Court pointed to the indirect nature of the union's injury as implicating practical concerns of judicial administration. If remote plaintiffs like the union were to be permitted to sue for damages, "potential plaintiffs at each level in the distribution chain would be in a position to assert conflicting claims to a common fund . . . thereby creating the danger of multiple liability" on the one hand or a "massive and complex" damages litigation on the other. Id. at 544-55. The Supreme Court concluded:

> [T]he nature of the Union's injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy [ ] weigh heavily against judicial enforcement of the Union's antitrust claim.

Id. at 545.

Applying these same factors to Appellants' Lanham Act claim similarly weighs against judicial enforcement of this claim. First, while there may be circumstances in which a non-competitor may have standing to sue as we noted earlier, the focus of the Lanham Act is on "commercial interests [that] have been harmed by a competitor's false advertising," Granite State Ins. Co. v. AAMCO Transmissions, Inc., 57 F.3d 316, 321 (3d Cir. 1995) (emphasis in original), and in "secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." S. Rep. No. 1333, 79th Cong., 2d Sess. (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275.

23

While the Appellants have alleged a commercial interest, they have not alleged competitive harm. Nor is there any indication that Appellants' good will or reputation have been harmed directly or indirectly. This is in contrast to cases like Waits and Camel Hair, in which the plaintiffs' good will and reputation were impacted by the defendants' conduct -- in Waits by falsely assuming the plaintiff 's voice, and in Camel Hair by falsely representing the characteristics of products marketed by the plaintiffs. As the District Court stated, "plaintiffs do not allege that defendants ran advertisements that said `don't buy engine additive at Conte Brothers or Hi/Tor -- instead, buy Slick 50 directly from the manufacturer.' " Conte Bros., 992 F. Supp. at 715. The type of injury suffered by Appellants -- loss of sales at the retail level because of alleged false advertising -- does not impact the Appellants' ability to compete; nor does it detract from the Appellants' reputation or good will. Therefore, the alleged harm is not of the "type that Congress sought to redress" by enacting the Lanham Act. Associated General, 459 U.S. at 538.

Appellants' remoteness from the allegedly harmful conduct also weighs against recognizing a right to sue on these facts. Here, as in Associated General, the "existence of an identifiable class of persons" -- manufacturers of competing products -- "whose self-interest would normally motivate them to vindicate the public interest . . . diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." Associated General, 516 U.S. at 542. Indeed, our decision in Serbin, in which we held that consumers whose purchases were influenced by false advertising lacked standing under S 43(a), involved more directly harmed plaintiffs than the retailer class in this case.

Furthermore, any damages suffered by Appellants were, if not speculative, then certainly avoidable. There is no allegation that Appellants, as retailers, were unable to stock Slick 50 for resale. If the retailers responded to the artificially-increased popularity of Slick 50 that allegedly resulted from the false advertising campaign by stocking Slick 50, they would not have suffered any damages. As the District Court recognized, the "interest that plaintiffs had in

24

preserving the reputation of motor oil and other competitors of Slick 50 appears to be a theoretical, rather than actual economic interest." Conte Bros., 992 F. Supp. at 715-16. This is in contrast to the concrete and unavoidable nature of the injury suffered by Quaker State's competitors who cannot reasonably be expected to retool their factory operations to meet the artificially-buoyed demand for Slick 50.

Finally, recognizing the right of every potentially injured party in the distribution chain to bring a private damages action would subject defendant firms to multiple liability for the same conduct and would result in administratively complex damages proceedings. Additionally, such a holding could result in an enormous number of relatively insignificant cases being litigated in the federal courts. If every retailer had a cause of action for false advertising regardless of the amount in controversy, regardless of any impact on the retailer's ability to compete, regardless of any impact on the retailer's good will or reputation, and regardless of the remote nature of the injury suffered, the impact on the federal courts could be significant. For example, under Appellants' theory, every corner grocer in America alleging that his sales of one brand of chocolate bars have fallen could bring a federal action against the manufacturer of another brand for falsely representing the chocolate content of its product. Such an action hardly seems befitting of a statute that was designed primarily to resurrect the federal tort of unfair competition after it was consigned to the post-Erie ashheap. See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition S 27:7 at 27-12 (Lanham Act drafted in part as "a reaction to the 1938 Erie Railroad Supreme Court decision, which it was widely felt, had eliminated the existing body of federal unfair competition common law.").

D.

In the alternative, the Appellants argue that they have sufficiently alleged a directly competitive relationship to withstand a motion to dismiss. They point to the following allegation in their Complaint:

25

> Slick 50 products are sold to major national retailers directly and through independent distributors. Direct sales are made to national and regional chain stores, to fast lube centers and to resellers and end users in large metropolitan areas.

Compl. P 19; A16. The District Court concluded that this allegation, while not entirely without ambiguity, generally described Slick 50's distribution pattern and could not reasonably be construed as alleging that Quaker State directly distributed products to end users. Conte Bros., 992 F. Supp. at 714. The District Court also noted that any ambiguity as to the meaning of the scope of this allegation was resolved by admissions in the plaintiffs' brief that the parties are not direct competitors. Id.; see also Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir. 1972) ("Judicial admissions are binding for the purpose of the case in which the admissions are made including appeals, and . . . an admission of counsel during the course of trial is binding on his client.").

Our conclusion would not be altered even if we were to assume some percentage of Slick 50's sales were made directly to end users and that the parties, therefore, were "competitors" in some limited sense. Under the reasoning we adopt today, standing under the Lanham Act does not turn on the label placed on the relationship between the parties. Given the existence of more directly injured parties, the tenuousness of Appellants' damages claims, and the possibility of multiple recoveries, we would not be inclined to revisit our conclusion that the Appellants lack standing even if we assumed a nominally competitive relationship.

In any event, Appellants clearly admitted in their District Court brief that the parties are not in direct competition, see Supp. App. 96 (Pls.' Br. in Opp. to Defs.' Mot. to Dismiss at 5 n.1) ("Plaintiffs are not in direct competition with Defendants"), and their alternative argument is therefore foreclosed on the grounds stated by the District Court.

III.

Expanding standing to parties such as Appellants would result in a great increase in marginal litigation in the

26

federal courts and would not serve the underlying purposes of the Lanham Act -- to ferret out unfair competitive methods and protect businesses from the unjust erosion of their good will and reputation. The test we adopt today, which was originally announced in Associated General in the context of standing under the Clayton Act, provides appropriate flexibility in application to address factually disparate scenarios that may arise in the future, while at the same time supplying a principled means for addressing standing under both prongs of S 43(a).

Applying those principles, we reach the same conclusion as did the District Court: the Appellants lack standing under S 43(a) of the Lanham Act. Accordingly, we affirm the judgment of the District Court dismissing this case and tax costs against the Appellants.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

27